# Exhibit C

# CAVANAUGH V. WOODS CROSS CITY

# EXPERT REPORT

# BY

# IAN SHEPHERD

| Private Investigator | **Ian Shepherd CAI** | Public Adjusting |
|---|---|---|
| Firearms Expert | Forensic, Investigation and Accident Reconstruction | Insurance Adjusting |
| Forensic Reconstructist | Private Investigator Lic. #P101575 | Education Provider |

4424 South Century Drive<br>
Murray, UT 84123<br>
Toll Free: (800) 928-2366  Phone: (801) 269-0199  Fax: (801) 269-0821

March 24, 2009

Kathleen McDonald
JONES, WALDO, HOLBROOK & MCDONOUGH
170 South Main Street #1500
Salt Lake City, UT 84101

  RE: Cavanaugh v. Woods Cross City

Dear Ms. McDonald:

  Please accept this as my expert report pursuant to the Rule 26 of Civil Procedure with regard to Cavanaugh v. Woods Cross City. In preparation for my report, I have reviewed the following documentation, authorities, and materials:

1. The Complaint.
2. The Answer.
3. Discovery with regard to the parties in the case including Interrogatories and Depositions.
4. Relevant Sections of the Utah Code Annotated (Use of Force).
5. Legislative notes with regard to Utah Statutes covering police officers' use of justifiable force.
6. Police officer training (post) manuals.
7. I have interviewed two former Utah police officers to determine the training and standard of care applicable to Utah police officer's use of force.
8. I have reviewed the continuum of force that is offered by Kevin Parsons, a nationally recognized expert on police officer use of force.
9. I have reviewed the general hiring practices of those hiring police officers and armed security, including employer requirements for emotional stability of police officers and armed security guard candidates.
10. I visited the scene of this incident and carefully walked around the premises running hypothetical questions on what could have possibly happened on the night in question.
11. I have interviewed Ms. Cavanaugh and discussed her recollection of the incident.
12. I have seen the clothing that Ms. Cavanaugh was wearing on the evening in question.

13. I have talked with other experts running hypotheticals, trying to determine the necessity and probability of use of force in this sort of an incident.
14. Review of training of Tasers with various officers' experience gained over time.
15. Radio transmissions on the date of the incident.
16. Taser International Training Program DVD and Manuals.
17. CA Law Enforcement training program regarding Tasers.
18. National and local cases involving Tasers.

## Opinion
### Background and Review of Materials

This is a case where a domestic disturbance occurred between Ms. Cavanaugh and her husband. The police were summoned by her husband on a **"non-emergency,"** to seek the safety of Ms. Cavanaugh who had left the home on a cold evening. Police responded to the scene. It is notable that a 14-year-old boy, James Kidder, was on a ride-along with the police officer in the police cruiser at the time of this incident. He testified that he witnessed the events at issue. It is unusual for a police officer to take a civilian, particularly a minor child, to the incident of a domestic disturbance, which by their nature are known to be potentially upsetting. This fact, right off the bat, shows poor judgment that this officer would respond to the scene of a domestic relations call with a child in the car. If this would have been a volatile situation where there was significant danger, the youth would have easily been harmed. Even though this is a sideline from the case, I believe it sets the stage for a couple of different things that should be taken into account. First of all, it's possible that Officer Davis may have been, in addition to putting the youth in potential danger, also subjecting him to witnessing violence caused by the officer. The officer may have been showing off to the youth by using gadgets such as the Taser in a non-conforming, unreasonable, unauthorized way.

Officer Davis approached Ms. Cavanaugh, and in his report claims he attempted to engage her in conversation. Ms. Cavanaugh continued walking to her home. When she approached the home, Officer Davis claims he told her to stop. Other than the boy in the police SUV with the windows up and other noise, no one heard the order to "STOP." When Ms. Cavanaugh did not stop, Officer Davis ended up Tasing Ms. Cavanaugh with an x26 Taser. Ms. Cavanaugh fell to the ground receiving a head injury as a result of this incident.

The standard of care with regard to this case is the appropriate and reasonable use of less than deadly forced is defined by Utah Statue, case law and department policy. There are several different types of less than deadly force that were available to Officer Davis including pepper spray, a baton, and most importantly, using a loud voice, ordering her to stop, and then grabbing the back of her shirt stopping her. Eventually, an officer is required to take physical control of a suspect anyway, and given Ms. Cavanaugh's body size vs. the officer's it appears that this could have easily been used to take her to the ground or stop her. (See Continuum of Force at Exhibit 1)

Mr. Murphy claims in his testimony, that he did not hear Officer Davis order Ms. Cavanaugh to stop. In addition, he claims he thought that Ms. Cavanaugh was not any kind of threat.

2

The appropriateness of these particular uses of force is what comes into question in this case. A definition of the use of less than deadly force scenarios is to stop someone from causing harm to persons or property and to avoid severely injuring the suspect (See case studies at Exhibit 2). Police officers are required to use only enough force as reasonably necessary to stop someone from doing harm to persons or property. In this case, there is no evidence that Ms. Cavanaugh fit the scenario for the use of force as none of the evidence indicates that she threatened Officer Davis or anyone in the house, or any property. At no time did Ms. Cavanaugh make any threats, have any weapon, or present such an imminent threat as to elicit any type of forceful intervention by the officer.

Rather, the evidence indicates that Ms. Cavanaugh was going home after going outside and taking a short walk while having an emotional upheaval over her relationship. Merely being upset does not make a person an imminent threat to those around them.

Regarding the issue of the possible weapon, the dispatch told Officer Davis that Ms. Cavanaugh may have a knife. Officer Davis did not see a knife. In fact Officer Davis makes no indication that he saw the knife at any time, and his report states that her arms were crossed making her possession of a knife unlikely.

If the facts are as Officer Davis indicated, that she had her arms folded, she was likely trying to keep warm on this cold December night. Such a position would not be feasible and for carrying a knife because the point would poke the blade in her side. No knife or weapon was ever found on Ms. Cavanaugh. In any event, Officer Murphy testified that her arms were at her side. Anatomically speaking, it would have been difficult for Ms. Cavanaugh to hide a knife, simply because her breasts would have been in the way where the knife would have been poking her in the side, if we are to believe Officer Davis as to how Ms. Cavanaugh was holding her hands.

In looking at the overall witness accounts of this incident and even by the officers own admissions, at no time did Ms. Cavanaugh exhibit any sort of threatening behavior that would warrant the use of force. Other officers state they were nearby "three houses up." If it was Officer Davis' intention to stop Ms. Cavanaugh from re-entering her home, then he had time to stop her at the front door. He could have simply grabbed her by the arm or shirt to stop her from continuing into her home. He could have blocked the door. The dispatcher and the police officers when first arriving to the scene, when talking to Mr. Cavanaugh, did not recognize that there was any danger in Ms. Cavanaugh returning to the home and creating a disturbance. If a threat existed, it would have been easy for the dispatcher or Officer Davis to tell Mr. Cavanaugh to lock the door so Ms. Cavanaugh could not re-enter. In addition, the other officers at the scene could have posted themselves at the front door until Ms. Cavanaugh could be found and the situation could be furthered evaluated. Apparently there was nothing to indicate an imminent threat and, therefore, no such instructions were given to Mr. Cavanaugh to lock the door or put an officer in front of the door. Ms. Cavanaugh was not properly dressed for the time of year and the weather. This would have made it easy to see that Ms. Cavanaugh had no weapons and, therefore, did not present any kind of threat. She was not swinging at the officers; she wasn't at all hostile. According to witnesses there was no conversation. This raises speculation that Ms. Cavanaugh did not even realize Officer Davis was

following her to her home because he was a few steps behind her and she was cold, and absorbed with thinking about her experience with her husband.

The best model regarding use of force is Kevin Parsons' Continuum of Force. The policy has been modified over the years and adopted in modified ways throughout all of law enforcement. Basically the policy indicates an officer should only use as much force as reasonably necessary to bring a suspect under arrest. There is no indication that Ms. Cavanaugh had committed any kind of a crime or presented any kind of situation that would require the use of any type of force, especially the use of a dangerous Taser.

Studies indicate that when someone is Tased they typically fall to the ground 100% of the time. See Taser International's own training manuals. In addition, Taser International explains the risk in their training manuals of the high likelihood of injuries from the fall after someone has been Tased. It is worth looking at Taser International's website as well as their training videos. You will notice whenever there is Taser contact, 100% of their trainers as well as suspects fall to the ground. Officer Davis should have recognized that it was obvious that upon being Tased, Ms. Cavanaugh was virtually guaranteed to fall, causing her severe injuries. In my observation and experience, 100% of Tased people fall and 0% are able to brace themselves. Care should be taken when using a Taser to make sure the Taser is used in a reasonable and appropriate manner, and that the suspect is not going to be unnecessarily injured as a result of the Taser use. It's unreasonable, unconscionable, and shocking to the conscience that this type of force would be used in this case. This case involves a woman who is returning to her home after going for a short walk, and is assaulted by the police on her own doorstep with significant injury as a result of negligent, unreasonable, unlawful, and excessive use of force.

Training of officers by Woods Cross City is clearly inadequate. In reviewing the totality of the information as contained by Taser International and various law enforcement agencies, the training emphasizes that the risk of the suspect falling to the ground and injuring themselves after being Tased is extremely high. Officer Davis should have taken into account that Ms. Cavanaugh would have been falling onto a hard concrete area when she was Tased. Woods Cross City gave little guidance to officers as to the use of the Taser except that it was left to use at their discretion, contrary to the manufacture's warnings. After all, the officer would still have to grab Ms. Cavanaugh after the use of the Taser. It is clear that the training given to Officer Davis failed and the warnings that were provided by Taser International were ignored. Woods Cross City contributed to this serious injury and bad incident by not making the officers aware of the risks of using the Taser and educating them on the likelihood that a fall on a hard cement surface could likely result in a serious injury. If the officers believed that Ms. Cavanaugh was disoriented, it increased the likelihood that any fall, particularly that by a Taser would make her more susceptible to significant injury as a result of the fall.

## Conclusion

Therefore, my opinion with regard to this incident is that:

4

1. This is a case that shocks the conscious and is a clearly unreasonable excessive use of force by Officer Davis. Officer Davis was not using good judgment if he really thought it was necessary to place Ms. Cavanaugh under arrest. Furthermore there was no probable cause for the officer to arrest Ms. Cavanaugh, let alone to use this much force.
2. According to Mr. Murphy, Officer Davis failed to tell Ms. Cavanaugh to stop and failed to give her appropriate time to respond to his commands.
3. Officer Davis endangered a juvenile member of the public by taking him to this type of a scene where the child was exposed to violence.
4. Officer Davis should have anticipated that Ms. Cavanaugh was going to fall upon being Tased, and she was going to hit a concrete surface of the porch on which she was standing. Injury is highly likely in this circumstance.
5. Officer Davis' actions were unreasonable in deploying the Taser. Officer Davis had time to grab the suspect, taking her into custody without incident. If Ms. Cavanaugh tried to pull away and get in her house as Officer Davis stated in his report, he could have easily grabbed her while she was trying to use the front door.

6. The time to draw from a support side holster meaning from the non-firing side of the body takes a great deal of skill and training. In timing to draw from this position may take 3-5 seconds even with exceptional training to draw a weapon and adequately deploy a Taser safely. It would have been much easier, given the time available, for Officer Davis to call other officers to come and help in this incident. Basically, if he had time to draw the Taser and effectively deploy the Taser, then he would have had time to notify the other officers that were standing nearby to come and assist. It took time to get the Taser out, aim, and shoot Ms. Cavanaugh. In addition, it seems like the response time to draw a Taser from a holster and deploy the Taser takes a considerable amount of time to complete this task. Therefore, of all the things Officer Davis could have done, use of the Taser was probably at the high end of the spectrum and was unreasonable, unnecessary and shows negligent training on the part of Woods Cross City and failure to follow the manufacturer's recommendations for use of the Taser.

If called to testify in with regard to this incident my testimony will be substantially in compliance with my report.

Sincerely,

*Ian Shepherd*

Ian Shepherd, CAI

Inc;
CV
Billing

5

# Exhibit 1
# Continuum of Force



# Exhibit 2
# Case Studies

Exhibit 2

Saucier v. Katz, 553 U.S. 194 (2001)

Pearson v. Callahan, 129 S. Ct. 808, 821 (2009)

Phillips v. James, 422 F .3d 1075, 1083 (10th Cir. 2005)

Graham v. Connor, 490 U.S. 386, 396-97 (1989)

Saucier, 533 U.S. at 205 (citations and quotations omitted)

Medina v. Cram, 252 F .3d 1124, 1133 (10th Cir. 2001)

Phillips, 422 F .3d at 1083

# Curriculum Vitae

| Private Investigator | **Ian Shepherd CAI** | Public Adjusting |
|---|---|---|
| Firearms Expert | Forensic, Investigation and Accident Reconstruction | Insurance Adjusting |
| Forensic Reconstructist | Private Investigator Lic. #P101575 | Education Provider |

4424 South Century Drive
Murray, UT 84123
Toll Free:   (800) 928-2366   Phone: (801) 269-0199   Fax: (801) 269-0821
email Drianshepherd@aol.com

## Curriculum Vitae March 17, 2009

### Experience
1996 – to present Investigator/Forensic Reconstructionist

* Safety Professional
* Private Investigator
* Insurance Adjustor
* Continuing Education Provider
* Certified Accident Investigator
* Human & Civil Rights Advocate
* Firearms Training & Education
* Violence in the Work place Trainer and author
* Risk Management
* Health & Wellness Instructor
* Researcher

> Duties include investigating various accident and death cases. The scope of my experience includes accident reconstruction, criminal case reconstruction. Forensic analysis and research, litigation preparation and evidence examination. Insurance education provider, firearm and injury expert. Violence in the workplace, employee wellness, training and safety program coordinator. Published author and Education provider. Expert witness.

1984 - 1996 - Insurance Professional – Legal Assistant, Investigator

* Life and Health Insurance agent
* Tax professional
* Paralegal work for law firms
* Investigator
* Adjuster

> Duties included preparation of insurance claims. Sales and servicing of insurance policies. Financial planning and tax accounting. Registered IRS certified tax preparer. All aspects of litigation and legal work. Investigator for law offices.

1980 - 1990 - United States Army Reserve and Paralegal Duties included various branches of service including administration and insurance claims. Various training programs including firearms and personnel management. Commissioned as a second lieutenant in May 1984. I worked with law firms and Weber County Attorney as intern and para-legal 1987 to 1991

## Education
U.S. Army Reserve Member (1980 to 1990)

*Extensive Education and Training
*Personnel Services
*Tactics
*Training of Soldiers
*Firearms
*Intelligence
*Survival
*Emergency Management
*Accident investigation and death claims

Weber State College, Ogden Utah, 1980 to 1985

General studies with emphasis in Criminal Justice, military science completion 1984, US Army commissioned.

Walls School of Insurance, Salt Lake Utah, 1981
    Agent, securities, life health and adjusting

Steve Love Adjusting School, 1987
    Salt Lake Utah Insurance adjusting 1, insurance and adjusting license

Accident Reconstruction Course, 1990
    North Western University, Chicago IL  Certification

La Salle University School of Law, New Orleans, Louisiana 1995-1996
    Various studies in litigation insurance and investigation

University of California, Berkeley, and Los Angeles 1989 & 1996
    Selected courses in physics and graduate work non credit

Cape Education Courses - Salt Lake, UT
    Adjusting
    HIPAA and Medicare
    Insurance digest I and II
    Terrorism insurance 2004 & 2006

National Association of Investigative Specialists

Forensic reconstruction course 2005 - 2007

National Association of Investigative Specialists 2007
Fraud Course, certified fraud investigator

Accident Reconstruction Course CAI (National Certification) 2006-2007

University of Utah – OSHA 511 Course completed March 2008

## Licenses and Certifications

Utah: Insurance independent adjuster resident license
Utah: Insurance public adjuster resident license
Utah: Private investigator resident agency license
Utah: Firearms instructor
NRA: National certified firearms instructor/rifle and pistol
CAI: National certified accident investigator/ Reconstructionist
National: Continuing education provider for insurance and other professionals
(Utah provider number 1537)

Utah armed security license

OSHA 511 Safety professional General industry certificate

## Publications/books and media publications

Genocide and Medical Experiments of the Nazi Holocaust
ISBN .0 9772 072
Copyright Ian Shepherd 2005

Insurance adjusting and bad faith CE 4 hour accredited
ISBN0: 0.9772076
Copyright Ian Shepherd 2006

Disaster Planning and training CE 4 hour accredited
ISBN.0.9772074
Copyright Ian Shepherd 2007

Use of Force and non-lethal weaponry
ISBN 0.9772075
Copyright Ian Shepherd 2007

Institutional Control, a History of Human Rights Abuses and Medical Experiments in America's Prisons and Asylums
ISBN .0 9772 073
Copyright Ian Shepherd 2007 Published with release date 2/15/2009

Violence in the workplace of public employees. A three hour continuing education course PPT - 2008

Wellness for public employees. A 6 hour continuing education course, PPT – 2008

## Expert testimony pursuant to Rule 26 Utah Rules of Civil Procedure and 16 Utah rules of Utah criminal procedure

State of Utah vs. Elnimeri Toto, Immigration Court, Case No.: A# 78-788-141, Testimony for Mr. Toto.

State of Utah vs. Santino Delacurz, Second district court, Case No. 1004887, Testimony for the Respondent

State of Utah vs. Izaiah Delacurz, Second district court, Case No. 1004886, Testimony for the Respondent

State of Utah vs. Camilla Molina-Delacurz, Second district court, Case No.: 1004884, Testimony for the Respondent

Samvelov vs. Road Star, Case No. 05-1005, Utah Industrial Commission, Testimony for the Plaintiff

State of Utah vs. Todd Mulder, Fifth district court Case No. 05-1501050,Utah Industrial Commission Testimony for the defense

Vicky Kay Robinson v. Henry Day Cleaners, Utah Industrial Commission, Claim No.: 200612107-E3, Testimony for defense

## Professional Associations
Western Airport Safety Group, Former Committee Member
Salt Lake International Airport Safety Former Committee, currently serving as Chairman
Salt Lake City Corporation Risk Management Former Committee, Member
National Claims Adjuster Former Association
Utah Insurance Adjusters Association, Former Vice President
Utah Public Adjusters Association, Former President and Vice President
International Survey of Human Rights, Director, Committee Member
Human Rights Campaign Fund, Committee Member
Amnesty International, Committee Member
Utah Investigators Association, Member
The Committee for Medical Ethics, Member
National Rifle Association, Legislative Committee Member
National Rifle Association, Instructors Association Member
Front Sight Firearms, Safety Institute Member
Utah Concealed Firearms Association, Member

National Firearms Instructors Association, Member
National Firefighters and Investigators Association, Member
Utah Private Investigators Association, Member, Former Chairman, Board Member
American Red Cross, Former Committee Member
United States Army Officers Association, Member
United States Army Reserve Officers Association, Member

### Ian Shepherd has specialty training and experience to include the following:

**Institutional Safety Professional** -- Experienced emergency manager, OSHA compliance officer, police officer and security training. Currently serves as safety professional for Salt Lake International Airport. Former chairman for the safety committee of the Salt Lake international Airport. Violence in the workplace committee member. Salt Lake City Wellness committee member. Former service on the Western Airport safety group as a committee member. In charge of all employees safety and safety compliance. Workers compensation, employee benefits and training programs, risk management for persons and property.

**Forensic Reconstruction** - Currently Ian is an instructor of accident reconstruction and insurance investigation classes, worked for several law firms with regard to various reconstructions and wrongful deaths. Reconstruction experience including firearms, suicides, accidents in the home, and criminal cases.

**Firearms** - Training for armed security, law enforcement, concealed carry permits and NRA training programs. Currently serves as an instructor for Utah firearms training and expert witness work regarding the use of deadly force.

**Genocide, Torture and Civil Rights** Currently lectures and serves as expert regarding torture, deadly force, prisons, and excessive force. Ian has written and lectured extensively on these topics worldwide. A recognized expert on genocide, torture, excessive force, and civil rights. In has been a guest speaker on several radio programs including National public radio. Ian has served as a goodwill ambassador for the international survey of human rights lecturing throughout Europe in 2005 and 2006.

**Insurance** - Including bad-faith, training adjusters, and continuing education professor for Utah insurance continuing education.

**Security**- Emergency management and evacuation plans, event security and risk control.

## FEES FOR EXPERT SERVICES
Investigation, Travel $175.00 per hour, $350.00 minimum
Deposition and Trial $250.00 per hour, $1000.00 minimum
Expenses for copies, records, travel, hotels, and equipment (market rate).