IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| SHANNON CAVANAUGH and BRAD CAVANAUGH,<br><br>Plaintiffs,<br><br><br>vs.<br><br><br>WOODS CROSS CITY and DANIEL DAVIS,<br><br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 1:08-CV-32-TC-BCW |

In December of 2006, Woods Cross City Police Officer Daniel Davis used a Taser on Plaintiff Shannon Cavanaugh. She and her husband, Plaintiff Brad Cavanaugh, claim that Officer Davis's actions that night violated Ms. Cavanaugh's Fourth Amendment rights under the United States Constitution, were tortious under Utah law and violated Utah's Constitution. Plaintiffs also maintain that Woods Cross City has incurred municipal liability for Officer Davis's actions because it implemented an unconstitutional use of force policy. The matter is before the court on the Defendants' motion for summary judgment. The court finds that disputed issues of material fact preclude summary judgment on the Fourth Amendment claim for both the officer and the municipality. But, with the exception of the Plaintiffs' intentional tort claims, summary judgment is granted to the Defendants on all state law claims.

**BACKGROUND**

On the evening of December 8, 2006, Officer Davis responded to a call for a domestic fight

involving a woman who had a knife.  Officers Dan Schultz and Jaclyn Moore also responded to the call.  When Officer Davis arrived at the Cavanaugh home, Officer Shultz told him that Ms. Cavanaugh had left the home on foot and had a kitchen knife.  (Officer Davis was familiar with the Cavanaughs as the result of an earlier domestic disturbance.)

After arriving at the Cavanaugh home, Officer Davis and other officers spoke to Mr. Cavanaugh.  Mr. Cavanaugh told them that Ms. Cavanaugh had a knife and might be suicidal.  He also told the officers that he and Ms. Cavanaugh had been drinking and taking prescription pain medications.  He informed the officers that he had had a slight tussle with Ms. Cavanaugh and she had tried to put him into a closet.  Mr. Cavanaugh did not want to have a physical fight with his wife and was able to get out of the closet.  Ms. Cavanaugh then got a kitchen knife and left the home.  Mr. Cavanaugh told the officers that Ms. Cavanaugh was upset the police had been called and likely would not cooperate with them because she did not want to be taken to the hospital.  Officers Schultz and Moore left the house to search for Ms. Cavanaugh, while Officer Davis remained with Mr. Cavanaugh.

The Cavanaugh's next door neighbor, James Murphy, could see what was happening outside the Cavanaugh home from his garage. In fact, Mr. Murphy had gone outside to see what was happening.  Mr. Murphy spoke with Officer Moore, who told him the officers were looking for Ms. Cavanaugh and that she might be armed with a knife.  Mr. Murphy testified that the visibility that night was "pretty good" and the area was illuminated by streetlights, house lights, and Christmas lights.  (Mem. in Opp'n Summ. J., Ex. C, at 29-31.)

After Officers Shultz and Moore had left the area, Mr. Murphy, from his vantage point in the garage, observed Ms. Cavanaugh walking north on the sidewalk towards her home.  Mr. Murphy

specifically looked at her hands because he had been told by officers that she had a knife.  He could

see that her hands were at her sides and clearly held no knife.  As Ms. Cavanaugh approached her

home, Officer Davis came out of the front door and walked down the driveway.

When Mr. Murphy saw Officer Davis come out of the Cavanaugh home, he began walking

down his driveway to get a better view.  Officer Davis was walking south toward Ms. Cavanaugh.

According to Mr. Murphy, Ms. Cavanaugh's hands were still at her sides and it was clear that she

was not holding a knife.  Mr. Murphy did not hear any either Officer Davis or Ms. Cavanaugh say

anything.[1]

When Officer Davis and Ms. Cavanaugh came within several feet of each other, Ms.

Cavanaugh turned off the sidewalk and began cutting across the lawn in a straight line toward her

front door.  She was walking quickly, but not running.  When she began crossing the grass, her hands

were still clearly visible at her sides.

At this time, Officer Davis and Ms. Cavanaugh were two steps apart.  Officer Davis set his

flashlight and clipboard down on the on the ground and began closely following Ms. Cavanaugh, no

more than six feet behind her.  He was moving quickly.  Officer Davis had a large size advantage

over Ms. Cavanaugh, who is a very small woman. Officer Davis began moving his Taser out of its

---

[1]Mr. Murphy did not specifically testify that, had Officer Davis spoken to Ms.
Cavanaugh, he would have been able to hear it.  But, in his deposition, Mr. Murphy describes the
events of December 6 in detail and was asked several times if Officer Davis spoke at certain
times during the encounter.  At two points Mr. Murphy was asked if heard any conversation
between Officer Davis and Ms. Cavanaugh and he answered "I didn't."  (Mem. in Opp'n Summ.
J., Ex. C, at 47, 50.)  At another point Mr. Murphy was asked if Officer Davis said anything and
he answered "no."  (Mem. in Opp'n Summ. J., Ex. C, at 53.)  At no time did Mr. Murphy
indicate that he was unsure if Officer Davis had spoken or that he would have had trouble
hearing.  There is at least an inference that Officer Davis did not speak at all to Ms. Cavanaugh
during the encounter and in this motion for summary judgment, all inferences must be made in
the favor of the nonmoving party (here, the Plaintiffs).

holster.  When Ms. Cavanaugh went up her front steps and approached the door, Officer Davis fired his Taser and hit Ms. Cavanaugh in the back.  At no time did he order her to stop or attempt to physically restrain her.[2]  Ms. Cavanaugh fell and she landed on her head on the concrete step.  Ms. Cavanaugh suffered a traumatic brain injury and has no memory of the events.

Woods Cross has a written policy stating Tasers may only be used when "a subject is threatening himself, an officer, or another person with physical force and where alternative restraint tactics have been or are reasonably likely to fail."  (Pl.'s Mem. in Opp'n Summ. J., Ex. M.)  But Woods Cross Police Chief Paul Howard testified that he instructed use of force trainers to abandon this continuum of force policy and employ a "reasonably necessary" test for the use of force.  (Id., Ex. N at 86-87.)  He also testified that contrary to the City's Use of Force policy, which states that "[i]t must be stressed that the use of force is not left to the unfettered discretion of the involved officer," officers were told that use of the Taser was entirely within their subjective judgment based on the totality of the circumstances.[3]  (Id. at 81-84.)  Chief Howard acknowledged that this difference

_____

[2]Officer Davis's testimony is markedly different from Mr. Murphy's.  Officer Davis testified that Ms. Cavanaugh's hands were hidden from view in her sweatshirt, that he attempted to identify her and she refused to give her name, that he twice ordered her to stop and tried to physically restrain her by grabbing her arm, and that she jerked her arm out of his grasp and began running away while keeping her hands hidden from view.  Because court must construe all facts in the light most favorable to the Plaintiffs, the facts are drawn from Mr. Murphy's testimony.

[3]In his deposition, Chief Howard was asked "[a]nd based on what you told me, it seems that the officers are trained on use of force and the elements of use of force, be it deadly force or something less than that, including Taser use, in a way that gives them complete subjectivity about when to apply which element, correct?"  (Paul Howard dep. at 91:1-6.)  Chief Howard agreed that the statement was correct.  He was also asked "[i]n the field it's 100 percent up to them, their pure subjective analysis, correct?"  (Id. at 92:13-15.)  Chief Howard answered "correct."  (Id. at 92:16.)  The questioner followed up "[s]o that is inconsistent with the plain language of this policy to the extent that it says that they don't have unfettered discretion, correct?"  (Id. at 92:17-19.)  Chief Howard replied "[i]f you're applying it to this particular

4

created an ambiguity in the use of force policy for any officer applying it in the field.

## ANALYSIS

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pueblo of Santa Ana v. Kelly, 104 F.3d 1546, 1552 (10th Cir. 1997).

I. Fourth Amendment Claim Against Officer Davis

Section 1983 provides a remedy against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects or causes to be subjected . . . to the deprivation of any rights, privileges or immunities secured by the Constitution and Laws." 42 U.S.C. § 1983. Government officials "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Guffey v. Wyatt, 18 F.3d 869, 871 (10th Cir. 1994).

In order to prevail against a defense of qualified immunity in a summary judgment motion, a plaintiff must first assert the violation of a constitutional or statutory right. See Davis v. Gracey, 111 F.3d 1472, 1478 (10th Cir. 1997). Second, a plaintiff must show that the "right was clearly established such that a reasonable person in the defendant's position would have known that [his] conduct violated the right." Id. Once a defendant raises the defense of qualified immunity, it is the

sentence, that would be correct." (Id. at 92:20-21.)

5

plaintiff's burden to show that the law was clearly established when the alleged constitutional violation occurred, and to present facts or allegations sufficient to show that the official violated the law.  See Guffey, 18 F.3d at 871.[4]  "When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied."  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (quotation omitted).

Claims of excessive or unreasonable force are analyzed under the Fourth Amendment's objective reasonableness standard.  Weigel v. Broad, 544 F.3d 1143, 1158 (10th Cir. 2008).  A court must consider whether "the officers' actions [were] objectively reasonable in light of the facts and circumstances confronting them, without regard to underlying intent or motivation."  Id. at 1151. "The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham v. Connor, 490 U.S. 386, 396 (1989).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Id. at 396-97.

It is without question that the use of excessive force violates the Fourth Amendment. Graham, 490 U.S. at 395.  But the contours of what constitutes excessive force are not always clearly established.  "[B]ecause excessive force jurisprudence requires an all-things-considered inquiry with careful attention to the facts and circumstances of each particular case, there will almost never be

_____

[4]The court is no longer required to address these two issues in the rigid order proscribed by Saucier v. Katz, 533 U.S. 194 (2001).  Pearson v. Callahan, 129 S. Ct. 808, 821 (2009).

a previously published opinion involving exactly the same circumstances.  We cannot find qualified immunity wherever we have a new fact pattern." <u>Casey v. City of Federal Heights</u>, 509 F.3d 1278, 1284 (10th Cir. 2007) (citation and quotation omitted).  The Tenth Circuit, therefore, applies "a sliding scale to determine when law is clearly established." <u>Id.</u>  Even when a court has not ruled on a similar factual situation before, qualified immunity will not be effective against an excessive force claim when there are "no substantial grounds for a reasonable officer to conclude that there was legitimate justification for his conduct." <u>Id.</u> at 1285 (quotation omitted).

Here, Officer Davis knew that Ms. Cavanaugh possibly had a knife, could be suicidal, had threatened to hurt herself on previous occasions, had physically struggled with her husband, had been drinking and taking pain medications and that Mr. Cavanaugh had reported his wife would be upset that the police were there and would not be cooperative.  Officer Davis testified that using a taser was the most effective way to stop Ms. Cavanaugh.  He testified that pepper spray does not work when the person has her back to the officer and that he had been trained not to use a baton if the person has a weapon like a knife.  He also testified that he was concerned that Ms. Cavanaugh could those inside the house if she entered.

The reasonableness inquiry depends on several factors including the alleged crime's severity, the threat posed by a suspect, and the suspect's efforts to resist or evade arrest.  <u>Marquez v. City of Albuquerque</u>, 399 F.3d 1216, 1220 (10th Cir. 2005) (citing <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)).  Any crime Ms. Cavanaugh had committed was extremely minor.  But Officer Davis could reasonably have believed she posed a danger to herself or others based on what he had been told about her state of mind and her possession of a knife.  Any such threat, however, was only moderate given Ms. Cavanaugh's diminutive size and strength.  Furthermore, at the time Officer Davis

deployed his Taser, Ms. Cavanaugh was not behaving in a threatening manner nor was she holding a weapon.  In addition, Ms. Cavanaugh was never ordered to stop or placed under arrest before the Taser was used.

Use of a Taser absent "any warning—or of facts making clear that no warning was necessary—makes the circumstances of this case especially troubling." <u>Casey</u>, 509 F.3d at 1285. Although not ruling out all possibility of use of a Taser against a nonviolent suspect, the Tenth Circuit placed significant emphasis on the resistance of the suspect against whom the Taser was used.  In addition, the presence of an adequate warning and opportunity to comply voluntarily is crucial.  <u>See id.</u>  Although Officer Davis may have had reasonable concerns for Ms. Cavanaugh's safety, Mr. Murphy's testimony was that Officer Davis said nothing to Ms. Cavanaugh and gave her no opportunity to comply.  "[I]t is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." <u>Id.</u> at 1286.  Furthermore, although Ms. Cavanaugh walked away from Officer Davis and toward her house, this cannot be construed as resistence.  Ms. Cavanaugh was "neither <u>actively</u> resisting arrest nor attempting to evade arrest <u>by flight</u>." <u>Casey</u>, 509 F.3d at 1282 (quotation omitted).  Under these circumstances a reasonable jury could find that Officer Davis did not have a reason to believe that lesser force would be effective and he is not entitled to summary judgment on the Fourth Amendment claim.

Furthermore, the law was clearly established at the time of this incident.  "An officer's violation of the <u>Graham</u> reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as [he] did." <u>Id.</u> at 1286.  The <u>Graham</u> factors in this case clearly cautioned against a

significant use of force, such as the deployment of a taser.  Moreover, in a similar case decided in 2007, the Tenth Circuit concluded that "the use of a Taser immediately and without warning against a misdemeanant" violated clearly established law.[5]  See Casey, 509 F.3d at 1286.  Accordingly, the court finds that Officer Davis is not entitled to qualified immunity and the motion for summary judgment on the Fourth Amendment claim is DENIED.

## II.   Fifth Amendment & Fourteenth Amendment Claims Against Officer Davis

The Plaintiffs argue that there was a violation of substantive due process only in the alternative to their Fourth Amendment claims.  Because the court concludes that Plaintiffs' claims against Officer Davis under the Fourth Amendment are not amenable to summary judgment, these claims are abandoned and will be DISMISSED.

## III.   Municipal Liability

Municipal liability under § 1983 for the actions of a municipal employee exists where (1) a municipal employee committed a constitutional violation; and (2) a municipal policy or custom was the moving force behind the constitutional deprivation.  Jiron v. City of Lakewood, 392 F.3d 410, 419 (10th Cir. 2004).  "An unconstitutional deprivation is caused by a municipal ' policy ' if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself."  Carney v. City & County of Denver, 534 F.3d 1269, 1274 (10th Cir. 2008).  Plaintiffs argue that the City's written policy, which implemented the continuum of force analysis for use of a Taser, was acceptable under the Constitution, but that Woods Cross had

---

[5]The Defendants argue that the Plaintiffs cannot rely on Casey because it was decided after this incident took place.  But Casey held that the officer's actions violated law that was clearly established at the time the incident in Casey took place.  So the law must have been clearly established at the time of Ms. Cavanaugh's encounter because it took place after the encounter in Casey.

an unwritten policy that was the moving force behind this alleged constitutional deprivation.

Specifically, Plaintiffs allege that Woods Cross's unwritten policy, established by Chief Howard, allowed for use of a Taser in the sole discretion of the officer without reference to warnings, violence of the offender, or danger to others.[6] Chief Howard clearly testified that he ordered trainers to abandon the written use of force policy and replace it with a "reasonably necessary" policy. Although Chief Howard's deposition is somewhat confused, he also consistently and repeatedly testified that officers were told in their training that the decision to use force is a solely subjective analysis.[7]

If true that a policy existed in which officers were trained to use only their own subjective judgment when firing a Taser, such a policy would be in violation of the constitutional standards for use of force.  See Graham, 490 U.S. at 396.  Therefore, provided it was the moving force behind the violation, the policy would subject the municipality to liability.  Jiron, 392 F.3d at 419.  In this case the Plaintiffs have shown that there are disputed issues of material fact regarding what policy was implemented in Woods Cross regarding use force.  Accordingly, the City of Woods Cross's motion for summary judgment is DENIED.

_____

[6]Plaintiffs are alleging Woods Cross has adopted an unconstitutional policy as the official position of the City, they are not alleging a failure to train or some other facially lawful action. Defendants argue that Plaintiffs must show the municipal action was taken with "deliberate indifference," but this standard applies only to facially lawful actions that lead an employee to violate a plaintiff's rights.  See Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997).  Adoption of an unconstitutional policy or custom does not require any such showing.

[7]Toward the end of Chief Howard's deposition, after consulting with counsel, he did indicate that he was unclear as to the difference between "objective" and "subjective."  But taking the evidence in the light most favorable to the nonmoving party, this testimony cannot overcome the extensive previous testimony on this topic.

IV.  Utah Constitutional Claims

Plaintiffs have brought a claim under Article I, Sections 7, 9, and 14, of Utah's Constitution, alleging that Ms. Cavanaugh's treatment violated her rights as secured by those sections.  Section 9 states: "Persons arrested or imprisoned shall not be treated with unnecessary rigor."  Sections 7 and 14 are analogous to the federal due process clause.

Damages are recoverable for violations of the Utah Constitution only if the provision violated is (1) self-executing, (2) the plaintiff suffered a flagrant violation of constitutional rights; (3) existing remedies do not redress the plaintiff's injuries; and (4) equitable relief was and is wholly inadequate to protect the plaintiff's rights or redress the plaintiff's injuries.  Spackman ex rel. Spackman v. Bd. of Educ., 16 P.3d 533, 537-39 (Utah 2000).  When considering the third prong, the Spackman court refused to reach the question of whether an adequate federal remedy would preclude a state constitutional claim.  Id. at 87 n.10.

Plaintiffs cannot state a claim for damages under the Utah Constitution because their injuries can be fully redressed through their 42 U.S.C. § 1983 claim.[8]  The Utah Supreme Court established this requirement to "ensure that courts use their common law remedial power cautiously and in favor of existing remedies."  Id. at 538.   Given the Utah Supreme Court's reluctance to expand direct remedies under the Utah Constitution, the court will not create such a remedy here where the plaintiff has not made a showing that § 1983 cannot provide recovery for all alleged injuries.  See Nielson v. City of South Salt Lake, 2009 WL 3562081 (D. Utah 2009).  The Defendants' motion for

---

[8]At the hearing on the motion for summary judgment, Plaintiffs argued that § 1983 was not a sufficient remedy because the state and federal law underlying the claims have different contours.  This, however, is not the test set forth by the Utah Supreme Court.  Rather, "a plaintiff must establish that existing remedies do not redress his or her injuries."  Spackman ex rel. Spackman v. Bd. of Educ., 16 P.3d 533, 538 (Utah 2000) (emphasis added).

summary judgment on the Utah Constitutional claims is GRANTED.

V.  Utah Tort Claims

Defendants argue that the Plaintiffs' state law tort claims against Deputy Davis should be dismissed under the Utah Governmental Immunity Act (UGIA).  In their complaint, Plaintiffs have alleged four tort claims: negligence, negligent infliction of emotional distress, loss of consortium, and intentional torts (assault, battery, and intentional infliction of emotional distress).  At the hearing on the motion for summary judgment, Plaintiffs agreed that all state tort claims, with the exception of the intentional torts, could be dismissed.  Accordingly, the court will only consider whether the intentional tort claims should go forward.

Because Deputy Davis is an employee, not a governmental entity, his immunity is waived when it is shown he "acted or failed to act through fraud or willful misconduct."  Utah Code Ann. § 63G-7-202(3)(c)(I).  The UGIA defines "Willful misconduct" as "the intentional doing of a wrongful act, or the wrongful failure to act, without just cause or excuse, where the actor is aware that the actor's conduct will probably result in injury."  Id. § 63G-7-102 (10).  "'Injury' means death, injury to a person, damage to or loss of property, or any other injury that a person may suffer to the person or estate, that would be actionable if inflicted by a private person or the private person's agent."  Id. § 63G-7-102 (5).

Defendants argue that, first, willful misconduct was not plead and, second, that there is no factual indication of willful misconduct.  Defendants' first argument is misplaced as the complaint specifically pleads that "Officer Davis tasered Shannon in the back, in an act of willful misconduct." (Compl. ¶ 26.)  Plaintiffs argue that Officer Davis would have been aware of the possible physical consequences of using a taser, primarily that the victim could lose control over her limbs and fall to

the ground with no ability to break the fall.  They argue that because Ms. Cavanaugh was standing

on concrete steps, a reasonable jury could find that Officer Davis knew that Ms. Cavanaugh could

be severely injured if he tasered her.  Summary judgment on the intentional tort claims (assault,

battery, and intentional infliction of emotional distress) is accordingly DENIED.  Summary judgment

for the claims of  negligence, negligent infliction of emotional distress, and loss of consortium is

GRANTED.

## ORDER

   For the foregoing reasons, the Defendants' motion for summary judgment is GRANTED

for the claims of violation of the Utah Constitution, negligence, negligent infliction of emotional

distress, and loss of consortium.  The motion for summary judgment is DENIED for all other

claims.

   DATED this 14th day of December, 2009.

                              BY THE COURT:

                              TENA CAMPBELL
                              Chief Judge